EMPLOYERS MUTUAL CASUALTY COMPANY, Plaintiff,

v.

PIEDMONT SUPPLY COMPANY, Inc., George H. Hargrave, John M. Geitner and Arrow Plumbing and Heating of Durham, Inc., Defendants.

No. C–112–D–59.

United States District Court
M. D. North Carolina,
Durham Division.

Aug. 25, 1961.

Egbert L. Haywood and Emery B. Denny, Jr., Durham, N. C., for plaintiff.

Dickson Phillips, Fayetteville, N. C., for defendants, Piedmont Supply Co., Inc., George H. Hargrave and John M. Geitner.

Robert I. Lipton, Durham, N. C., for defendant, Arrow Plumbing & Heating of Durham, Inc.

EDWIN M. STANLEY, Chief Judge.

This action seeks an adjudication of the liability of the defendants, Piedmont Supply Company, Incorporated, George H. Hargrave, and John M. Geitner, under certain indemnity agreements executed in favor of the plaintiff. The plaintiff alleges that by virtue of the indemnity agreements it executed some sixteen payment and performance bonds on behalf of the defendant, Arrow Plumbing and Heating of Durham, Incorporated; that said defendant defaulted in performance of certain of the contracts covered by the bonds, thereby obligating plaintiff to take over and complete the contracts; and that the defendants, Piedmont Supply Company, Incorporated, George H. Hargrave and John M. Geitner are liable under their indemnity agreements for all losses sustained by the plaintiff. The defendants, Piedmont Supply Company, Incorporated, George H. Hargrave and John M. Geitner, contend that since a series of indemnity agreements were executed, their liability should be limited to the losses sustained by the plaintiff under specific bonds issued by the plaintiff on behalf of the defendant, Arrow Plumbing and Heating of Durham, Incorporated, and not all the bonds.

Prior to the trial, the parties stipulated that the court should first determine the specific payment and performance bonds with respect to which the defendants, Piedmont Supply Company, Incorporated, George H. Hargrave and John M. Geitner, as indemnitors, are liable to the plaintiff, and that the question as to the amount or extent of the liability of any of the defendants to the plaintiff would be reserved pending the court's determination of the first issue.

The case was tried by the court without a jury. At the conclusion of the trial, the parties were given an opportunity to file requests for findings of fact and conclusions of law, and briefs in support of their contentions.

The requests for findings of fact and conclusions of law and briefs of the parties having been received, the court, after considering the pleadings and the evidence, including the stipulations and exhibits filed, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

### Findings of Fact.

1. The plaintiff, Employers Mutual Casualty Company (hereinafter referred to as "Employers"), is a corporation organized and existing under the laws of the State of Iowa, and maintains its principal office and place of business in the City of Des Moines, Iowa.

2. The defendant, Piedmont Supply Company, Incorporated, (hereinafter referred to as "Piedmont"), is a corporation organized and existing under the laws of the State of North Carolina, and maintains its principal office and place of business in Cumberland County, North Carolina.

3. The defendant, George H. Hargrave (hereinafter referred to as "Hargrave"), is a citizen and resident of Cumberland County, North Carolina.

4. The defendant, John M. Geitner (hereinafter referred to as "Geitner"), is a citizen and resident of Catawba County, North Carolina.

5. The defendant, Arrow Plumbing and Heating of Durham, Incorporated (hereinafter referred to as "Arrow"), is a corporation organized and existing under the laws of the State of North

Carolina, and maintains its principal office and place of business in Durham County, North Carolina.

6. The matter in controversy, exclusive of interest and costs, exceeds the sum of $10,000.

7. Piedmont, at all times pertinent, has been engaged in the business of supplying plumbing and heating equipment, fixtures, materials and supplies to persons, firms and corporations engaged in the plumbing and heating contracting business.

8. The defendant, Geitner, has been president of Piedmont for the past twelve years, and owns 449 of the 900 issued and outstanding shares of capital stock of said corporation.

9. The defendant, Hargrave, has been vice president and treasurer of Piedmont for the past twelve years, and owns 449 of the 900 issued and outstanding shares of capital stock of said corporation.

10. As officers and stockholders of Piedmont, the defendants, Geitner and Hargrave, were paid substantial salaries by said corporation in the years 1956 through 1959.

11. During the years 1956 through 1959, the defendant, Arrow, was engaged in plumbing and heating contracting as its principal business.

12. The plaintiff is duly authorized by a charter and is engaged in the business of executing and becoming surety on various and sundry bonds guaranteeing the performance of contracts, and the payment of laborers, materialmen and suppliers thereunder, for contractors.

13. The first contact any of the defendants had with the plaintiff was in 1955, when the defendants, Piedmont and Hargrave, executed a paper writing agreeing to indemnify the plaintiff against loss by reason of its execution of a performance bond on behalf of J. J. Barnes Company, a customer of Piedmont.

14. Sometime prior to July 18, 1956, the defendants, Hargrave and Geitner, contacted Joe Norton, one of the plaintiff's agents, with the view of getting plaintiff to execute a performance bond with respect to a plumbing contract Arrow, one of its customers, held or was bidding on in connection with a Capehart Housing project at Fort Bragg, North Carolina. After receiving financial statements from certain of the defendants, it was agreed that plaintiff would execute the performance bond for Arrow in connection with said contract, provided Piedmont, Hargrave and Geitner would agree to indemnify and hold harmless the plaintiff against any loss by reason thereof.

15. Pursuant to said understanding and agreement, the defendants, Hargrave and Piedmont, on July 18, 1956, executed and delivered to the plaintiff a written instrument, captioned "Indemnity Agreement," in words and figures as follows:

"This Agreement, made this 18th day of July, 1956, by and between Arrow Plumbing & Heating Company (hereinafter called the Applicants), George H. Hargrave, Individual, Piedmont Supply Company, Inc. (Corporation), and others if any whose names are subscribed hereto (hereinafter called the Guarantors), on the one part and the Employers Mutual Casualty Company (hereinafter called the Company) on the other part Witnesseth:

"Whereas, the Applicants, on their own behalf and the behalf of others, may be required from time to time to give or furnish various and sundry bonds guaranteeing the performance of contracts, or in connection with litigation pending in the courts, or other bonds required or allowed by law; and

"Whereas, the Company is duly authorized under its charter to execute and become surety upon any and every such bond;

"Now, Therefore, in consideration of the premises, and of the mutual advantages accruing to each of the parties hereto, it is agreed:

"First: That the Applicants will apply to the Company for the execution of bonds which the Applicants may desire or be required to give.

"Second: The Company agrees to execute for and on behalf of the Applicants, each and every such bond applied for; provided, however, that the Company shall not be required to execute bonds in states or territories where it is not authorized to transact such business; and provided, further, that the Company shall not be held responsible for the refusal of any party, court or department to approve such bond; and also further provided, that at any time when the Company feels that it would be insecure in the execution of bonds in behalf of the Applicants without indemnity or collateral security, such indemnity or collateral shall be furnished by the Applicants, or the Company may decline to execute such bond.

"Third: The Applicants and Guarantors further agree to at all times indemnify and keep indemnified the Company, and hold and save it harmless against any and all demands, liabilities, charges and expenses of whatsoever kind or nature, including counsel and attorney's fees, which it shall at any time sustain or incur by reason or in consequence of the execution by it of any and every bond or undertaking whatsoever at the instance or request or in behalf of the Applicants; and to pay over, reimburse and make good to the Company, its successors and assigns, all sums and amounts of money which the Company or its representatives shall pay, or cause to be paid, or become liable to pay under its obligation upon any such bond or undertaking, as well as all charges and expenses of whatsoever kind or nature, including counsel and attorney's fees, by reason of the execution thereof, or in connection with any litigation, investigation or other matters connected therewith, such payment to be made to the Company as soon as it shall have become liable therefor, whether or not it shall have paid out such sum or any part thereof, and without regard as to whether the Company may have taken or may hold other indemnity or security.

"It is further agreed that in any settlement between the Applicants or the Guarantors and the Company, the vouchers or other proper evidence showing the payment by the Company of any loss, damage or expense, shall become conclusive evidence against the Applicants and the Guarantors of the fact and amount of liability to the Company, provided that such payment shall have been made by the Company in good faith, believing that it was liable therefor.

"It is further agreed that the applicants and guarantors will pay annually in advance the premiums or charges made for each and every bond executed under this agreement, said premiums or charges to be in accordance with the Manual of Rates in force at the time a bond is executed.

"Fourth: The Applicants and Guarantors further agree that in case any action at law, in equity or other proceeding be commenced, or notice of such action, suit or proceeding be served upon them, affecting the liabiltiy of the Company upon any such bond or undertaking, or growing out of any matter connected therewith or on account of which any bond or undertaking was given, they will immediately so notify the Company at its office in the City of Des Moines, Iowa.

"Fifth: The Applicants and Guarantors further agree that no act or omission of the Company in modifying, amending, limiting or extending any instrument so executed

by the Company, shall in any wise affect the liability of the Applicants or the Guarantors hereunder, nor shall the Applicants or Guarantors or any of them be released from this obligation by reason thereof; and they agree that the Company may alter, change, modify, amend, limit or extend any and every such instrument, and may execute renewals thereof, and other and new obligations in place or in lieu thereof, and without notice to the Applicants or the Guarantors, notice being expressly waived; and in any and every such case the Applicants and the Guarantors and each of them shall be liable to the Company as fully and to the same extent on account of any and every such altered, changed, modified, amended, limited or extended instrument, and renewals thereof, as if such instrument was described at length therein.

"Sixth: The Applicants and the Guarantors further agree that it shall not be necessary for the Company to give them or either of them notice of any act, fact or information coming to the notice or knowledge of the Company concerning or affecting its rights or liabilities under any such instrument by it so executed, notice of all such being hereby expressly waived.

"Seventh: The Applicants and Guarantors further agree that in the event of the failure to comply with, or make due performance of, any of the above and foregoing covenants and agreements, the Company may at any time thereafter take such steps as it may deem necessary or proper to obtain its release from any and all liability under any and every such bond, and to secure and further indemnify itself against loss, and all damage and expense which the Company may sustain or incur or be put to in obtaining such release, or in further securing itself against loss,

shall be borne and paid by the Applicants and the Guarantors.

"Eighth: This agreement shall be binding upon the Applicants and the Guarantors, jointly and severally, and as well upon their respective heirs, executors, administrators, successors and assigns.

"Ninth: It is further understood and agreed that this agreement shall be held for the benefit of any Company or Companies that have joined or may hereafter join at the request of the Employers Mutual Casualty Company as co-surety in the execution of the within mentioned bonds.

In Testimony Whereof, we have hereunto set our hands and affixed our seals, the day and date before mentioned.

"Witness

(S) "George H. Hargrave (Seal)

"George H. Hargrave—Individual

"Piedmont Supply Company, Inc. (Seal)

"By: (S) G. H. Hargrave

(Seal)"

16. On the same date, viz., July 18, 1956, the defendants, Geitner and Piedmont, executed and delivered to the plaintiff a written agreement captioned "Indemnity Agreement," which said agreement was in form and content identical with the written agreement executed by Hargrave and Piedmont.

17. On several occasions, both prior and subsequent to the execution and delivery of the indemnity agreements of July 18, 1956, the defendants, Piedmont, Hargrave and Geitner, transmitted to the plaintiff financial statements and reports indicating the financial worth and condition of said defendants.

18. Following the execution and delivery to the plaintiff of the aforementioned indemnity agreements on July 18, 1956, Arrow applied to the plaintiff for, and the plaintiff executed on behalf of Arrow, the following payment and performance bonds:

| Date of Bond | Amount of Performance Bond | Amount of Payment Bond | Location |
|---|---|---|---|
| 7/23/56 | $202,990.00 | | Capehart Housing, Ft. Bragg, N. C. |
| 7/26/56 | 58,539.00 | | R. R. Track & Magazine, Naval Air Station, Edenton, N. C. |
| 7/27/56 | 17,600.00 | | Telephone Building, Naval Air Station, Edenton, N. C. |
| 12/27/56 | 191,000.00 | $ 95,500.00 | 8th Increment, Camp LeJeune, N. C. |
| 12/31/56 | 144,435.00 | | Dorm. & Officers Qtrs., Seymour-Johnson Air Force Base, Goldsboro, N. C. |
| 2/7/57 | 195,883.00 | 97,941.50 | 9th Increment, Camp LeJeune, N. C. |
| 4/18/57 | 804,723.00 | 804,723.00 | Barracks, Ft. Jackson, Columbia, S. C. |
| 7/19/57 | 189,861.00 | 94,930.50 | 10th Increment, Camp LeJeune, N. C. |
| 2/25/58 | 2,934.00 | 1,467.00 | Installation of Heaters, Seymour-Johnson Air Force Base, Goldsboro, N. C. |
| 5/20/58 | 94,834.00 | 47,417.00 | Courthouse Bay |
| 6/4/58 | 67,569.00 | | McDougal Terrace Housing Project, Durham, N. C. |
| 6/12/58 | 47,516.00 | | Naval Air Station, Harvey Point, N. C. |
| 6/23/58 | 57,200.00 | 28,600.00 | Base Chapel & Educ. Bldg., Seymour-Johnson Air Force Base, Goldsboro, N. C. |
| 6/23/58 | 53,900.00 | 26,950.00 | Armament & Elect. Bldg., Seymour-Johnson Air Force Base, Goldsboro, N. C. |
| 6/23/58 | 23,000.00 | 11,500.00 | Ammunition & Arms Storage Facilities, Seymour-Johnson Air Force Base, Goldsboro, N. C. |
| 8/25/58 | 37,944.00 | | Phillips Hall Addition, University of N. C., Chapel Hill, N. C. |

19. Arrow was unable to perform certain of said contracts on which the plaintiff executed payment and performance bonds, in consequence of which Employers has been called upon to pay for labor, material and other expenses in connection with the completion of the work.

20. Prior to the acceptance of each of the aforementioned contracts by Arrow, representatives of Arrow conferred with representatives of Piedmont with reference to the cost of materials and supplies to be used in the performance of said contracts.

21. Piedmont furnished materials and supplies to Arrow for use in connection with each of the contracts for which Employers executed payment and performance bonds. The total purchase price of the materials and supplies purchased by Arrow from Piedmont in connection with said contracts exceeds $1,000,000 for which Arrow had paid Piedmont prior to the institution of this suit in excess of $930,000.

22. On December 14, 1956, Piedmont and Geitner, at Employers' request, executed and delivered to Employers another indemnity agreement, in form and content identical with the indemnity agreement executed on July 18, 1956.

23. On July 25, 1957, Geitner, at Employers' request, executed and delivered to Employers another indemnity agreement, in form and content identical with the indemnity agreement executed on July 18, 1956, except Geitner was designated as the applicant and the space for the designation of the guarantor was left blank.

24. On August 7, 1958, Geitner, Hargrave and Piedmont, at Employers' request, executed and delivered to Employers three additional indemnity agreements, in form and content identical with the indemnity agreements executed on July 18, 1956, except Geitner, Hargrave and Piedmont were designated as applicants and Arrow was designated as guarantor. Each of the three agreements are identical in form and content.

25. None of the aforementioned indemnity agreements refer to any specific job or contract.

26. At no time between July 18, 1956, the date of the execution of the first indemnity agreement, and August 25, 1958, the date of the execution of the last payment and performance bond by Employers for Arrow, did either Geitner, Hargrave or Piedmont give any notice to Employers that they were no longer to be held responsible under any of the indemnity agreements.

27. Geitner, Hargrave and Piedmont had immediate, substantial, material and beneficial interest in all the contracts of Arrow upon which Employers executed payment and performance bonds, since it was contemplated that Arrow would purchase a large part of the materials and supplies necessary for the completion of said contracts from Piedmont.

28. The execution and delivery of the aforementioned indemnity agreements were material considerations for Employers' executing the payment and performance bonds for Arrow.

29. Employers did not systematically give notice to either Piedmont, Geitner or Hargrave of the execution of all the payment and performance bonds for Arrow. However, Geitner and Hargrave did know that Arrow had obtained all the contracts for which payment and performance bonds had been written, and knew that Piedmont was supplying most of the materials and supplies to Arrow to perform the contracts. Geitner and Hargrave also knew that payment and performance bonds were generally required on the type of work Arrow was doing, and that Arrow was dealing with Employers with respect to such bonds. Additionally, Geitner and Hargrave knew that Employers had written bid bonds for Arrow on all the contracts involved, and there were conversations and exchanges of correspondence between representatives of Employers and the defendants, Geitner and Hargrave, with respect to the performance of the various contracts and the progress of the work.

30. All the aforementioned indemnity agreements signed by Piedmont, Geitner and Hargrave were mailed to them by Employers, and they were returned to Employers by mail after they had been signed.

### Discussion.

The issue presented for determination is whether the defendants, Piedmont, Hargrave and Geitner, are liable to the plaintiff as indemnitors with respect to losses sustained under all payment and performance bonds written for Arrow, or are only liable for losses sustained with respect to certain specific bonds. The plaintiff contends that the indemnity agreements executed on July 18, 1956, covered all bonds thereafter executed on behalf of Arrow, and that the additional indemnity agreements only served to confirm the fact that the defendants desired to remain bound by the original agreements. The defendants take the position that the sum total of all negotiations and transactions between them and the plaintiff, when correctly interpreted, discloses that the various indemnity agreements were intended only to apply to specific bonds, and not all bonds the plaintiff might write for Arrow, and that their liability should be so limited. The determination of the issue presented depends to a large extent upon what the parties actually intended, to be gathered from all of the transactions and attending circumstances.

The defendants first argue that since only one performance bond was written for J. J. Barnes Company pursuant to an indemnity agreement they executed in favor of the plaintiff in 1955, and that since this agreement by its terms was a continuing one, this led them to believe that future indemnity agreements would only relate to one bond. The evidence does not support this argument. While only one bond was written for Barnes under the 1955 indemnity agreement, the evidence indicates that Barnes considered it to be a continuing agreement, and that it would cover all future business requiring the execution of payment and performance bonds. This is borne out by the fact that on January 16, 1956, Barnes wrote the plaintiff that the indemnity agreement the defendants had signed "still holds good for any future business," and that he was looking forward to the plaintiff handling his entire account. A representative of the plaintiff testified that after the first bond was written, Hargrave told him not to issue additional bonds for Barnes since Barnes was buying materials from another supplier. It is not felt that the Barnes transaction has any material bearing one way or another on the issue here presented.

It is conceded that a short time prior to July 18, 1956, Hargrave contacted Joe Norton, one of plaintiff's representatives, and advised that Arrow was low bidder on a Capehart Housing project at Fort Bragg, North Carolina, and that if the plaintiff would write the performance bond for Arrow, he and his company would indemnify and hold harmless the plaintiff against any loss. Shortly thereafter, Hargrave and Geitner were furnished with the indemnity agreements that were signed on July 18, 1956. The agreements were immediately executed and returned to the plaintiff. Hargrave stated that he did not remember by what method he obtained or returned the indemnity agreements, but Geitner testified that he was of the opinion that they came in the mail. Neither Hargrave nor Geitner could give any reason for their impression that the indemnity agreements only covered the bond to be written in connection with the Capehart Housing project, except the fact that no other contracts were discussed and only one bond had been signed for the J. J. Barnes Company. There is no suggestion that the plaintiff practiced any fraud or deceit upon any of the defendants, or made any misrepresentations to any of them, in order to obtain the execution of the agreements.

It should be pointed out that no explanation was given by anyone as to why the

plaintiff requested two separate indemnity agreements to be executed, one by Hargrave and Arrow and another by Geitner and Arrow. In any event, both agreements were identical in their terms and, if otherwise enforceable, would serve to make the defendants, Piedmont, Hargrave and Geitner, jointly and severally liable to the plaintiff for all losses sustained by reason of its execution of payment and performance bonds for Arrow.

 There is nothing ambiguous about the indemnity agreements. Arrow is designated as the Applicant; Piedmont, Hargrave and Geitner are designated as the Guarantors; and Employers is designated as the Company. After reciting that the applicant "may be required from time to time to give or furnish various and sundry bonds guaranteeing the performance of contracts," the company then "agrees to execute for and on behalf of the Applicant, each and every such bond applied for * * " Following this, the guarantors "agree to at all times indemnify * * * and hold and save * * * harmless" the company "against any and all demands, liabilities, charges and expenses of whatsoever kind or nature * * * " which the company might "sustain or incur by reason or in consequence of the execution by it of any and every bond or undertaking whatsoever at the instance or request * * * " of the applicant. Thus, the defendants expressly agreed to indemnify and save harmless the plaintiff from any losses it might sustain by reason of its execution of any bonds at any time in the future on behalf of Arrow. As earlier noted, neither Hargrave nor Geitner contend that any representation was made by any representative of plaintiff that the indemnity agreements would only apply to the Capehart Housing project bond, but simply state that since this was the only contract discussed, they gained that impression. This evidence is clearly insufficient to modify or limit the plain terms of the agreements. The defendants had every opportunity to read the agreements, and insist that they be limited as to scope and time, if they so desired. Under these circumstances, the defendants, having full opportunity for information as to the contents of the agreements, cannot escape the consequences on the ground of their own omission to read them. Rudy v. Eagle Indemnity Co., 5 Cir., 1949, 178 F.2d 94, and W. B. Coppersmith & Sons, Inc. v. Aetna Ins. Co., 1942, 222 N.C. 14, 21 S.E.2d 838. A contract of indemnity continues in force during such time as is provided by its terms. Employers' Liability Assurance Corporation v. Tebbs, D.C.Wyo. 1956, 137 F.Supp. 869. While it is a cardinal rule that in the construction of indemnity contracts that effect must be given to the intention of the parties, if such can be done consistently with legal principles, such contracts nevertheless must "receive a reasonable construction so as to carry out, rather than defeat, the purpose for which they were executed." 27 Am.Jur., Indemnity, Section 13. The law presumes that parties intend what the language used clearly expresses, and a contract must be construed to mean what on its face it purports to mean. "The Court, under the guise of construction, cannot reject what the parties asserted * * * or insert what the parties elected to omit * * * It has no power to write into the contract any provision that is not there in fact or by implication of law." Hartford Accident & Indemnity Co. v. Hood, 1946, 226 N.C. 706, 40 S.E.2d 198, 201. "Neither party can obtain an interpretation and result contrary to the express language of a contract by the assertion that it does not truly express his intent." Fidelity & Casualty Co. of New York v. Nello L. Teer Company, 1959, 250 N.C. 547, 109 S.E.2d 171, 173. "When a court is called upon to interpret, it seeks to ascertain the intent of the parties at the moment of execution. To ascertain this intent, the court looks to the language used, the situation of the parties, and objects to be accomplished. Presumably the words which the parties select were deliberately chosen and are to be given their ordinary significance." Briggs v. Ameri-

can & Efird Mills, Inc., 1960, 251 N.C. 642, 111 S.E.2d 841, 843. Piedmont, Hargrave and Geitner could have terminated their indemnity agreements at any time by giving reasonable notice to the plaintiff. Fulghum v. Town of Selma, 1953, 238 N.C. 100, 76 S.E.2d 368. They gave no such notice, and it reasonably can be presumed that they desired the arrangement to continue, particularly since they were selling Arrow substantial quantities of supplies on all jobs bonded by the plaintiff.

The defendants place great emphasis on the fact that the plaintiff requested indemnity agreements from one or more of them on three separate occasions after the execution of the agreements on July 18, 1956, and argue that this indicates a clear intention on the part of both parties to limit the first indemnity agreements to any liability that the plaintiff might incur by reason of its execution of the bond on the Capehart Housing project. They admit their liability on this bond, and certain bonds executed on June 23, 1958, claiming that these were specific bonds executed pursuant to specific indemnity agreements. The reasons for requesting the additional indemnity agreements are not clear. In each instance, they were mailed to either Hargrave or Geitner with the request that they be signed. They were generally referred to as "current" indemnity agreements. They were signed in the form requested, and returned to the plaintiff without question or comment. The local agent for the plaintiff stated that he had no knowledge as to why they were requested, but that he mailed them to Hargrave and Geitner at the request of the home office. C. Leonard Williams, bond underwriter in plaintiff's home office, testified that he requested the additional indemnity agreements for evidence of the continuation of the original agreements; that he always considered the original agreements to be in force, but simply wanted "some written evidence that these gentlemen were continuing and knew they were continuing." He further ex-

plained that this just happened to be the method employed by his home office to make sure that Hargrave and Geitner knew that the plaintiff was continuing to write bonds for Arrow under the original indemnity agreements.

There was much evidence tending to indicate that Hargrave and Geitner, individually and as officers of Piedmont, had full knowledge of all the transactions, and that they fully intended to be bound at all times by the indemnity agreements. At about the time the first indemnity agreements were executed in July of 1956, representatives of plaintiff held a conference in Charlotte, North Carolina, with Geitner and his accountant, at which time the indemnity agreements were discussed in some detail. The conference was called by John J. Kelleher, one of plaintiff's agents, for the purpose of explaining the "full impact" of the indemnity agreements. Joe Norton was also present. Norton testified that he explained to Geitner in great detail the meaning of the continuing indemnity agreements, and promised to keep Geitner and Hargrave advised from time to time of the progress of the various jobs, as he did not want them to get "injured in this transaction." He further testified that either Geitner or Hargrave was kept currently informed with respect to all Arrow contracts. Kelleher testified that he also explained to Geitner the "full impact" of the indemnity agreements, and that the agreements were intended "to take care of any work that Arrow did." He further testified that he cautioned Geitner to keep close supervision over Arrow so that he and his associates "would know what they were doing." On May 30, 1958, Norton wrote Geitner that Arrow had obtained a contract with the McDougal Terrace Housing project for approximately $100,000, and that, as usual, he "would execute the performance bond when it is presented for this work with you indemnifying it." Again, on July 10, 1958, Norton wrote Geitner that he thought it would be a good idea to discuss the Arrow ac-

count with him and Hargrave, as he would like to know just how far they wanted him to go in continuing to bond Arrow. Norton further reminded Geitner in this letter that all the work Arrow was doing was personally indemnified by him and his company.

Following the conference held in Charlotte in July of 1956, Employers wrote the sixteen payment and performance bonds hereinbefore referred to. No limitation with respect to the indemnity agreements was ever discussed. During this period, Piedmont sold Arrow supplies and equipment on these bonded jobs in excess of a million dollars. Arrow was in bad financial condition, a fact known to Hargrave and Geitner as well as Employers. Employers refused to sign a payment and performance bond for Arrow on the Capehart Housing project without the indemnity agreements signed by Hargrave, Geitner and Piedmont. There is nothing in the record to indicate that Employers would have executed any further payment and performance bonds for Arrow had it not been relying upon the indemnity agreements.

There is nothing in the indemnity agreements requiring notice before the execution of each payment and performance bond, but there is credible evidence that both Geitner and Hargrave were kept currently advised as to the bonds being written. The individual defendants admitted their familiarity with the various jobs Arrow was doing, and knew that they were supplying sizeable quantities of material for each of the jobs. There is every indication they knew that Arrow had to have payment and performance bonds on each of the jobs, and that these bonds were being written by Employers.

In view of what has been said, it is concluded that Piedmont, Hargrave and Geitner remained bound by the terms of the original indemnity agreements executed on July 18, 1956, throughout the entire period Employers wrote payment and performance bonds for Arrow.

### Conclusions of Law.

1. The court has jurisdiction of the parties and of the subject matter.

2. The defendants, Piedmont, Hargrave and Geitner, as evidenced by the indemnity agreements dated July 18, 1956, agreed to indemnify and save harmless Employers from any loss or liability it might sustain by reason of its execution of the various surety and performance bonds on behalf of Arrow.

3. The indemnity agreements were supported by adequate consideration, were to the mutual advantage and benefit of Employers and the defendants, Piedmont, Hargrave and Geitner, and are in all respects valid and enforceable.

4. The defendants, Piedmont, Hargrave and Geitner, are jointly and severally liable, as indemnitors, to the plaintiff with respect to the amounts paid and expenses incurred by reason of the execution of the various payment and performance bonds on behalf of Arrow, to the extent provided for in said indemnity agreements.

In accordance with the stipulation of the parties, this matter is retained for the purpose of determining the amount the plaintiff is entitled to recover. In the event the parties are unable within 60 days to reach an amicable settlement with respect to the losses sustained by the plaintiff, the plaintiff shall immediately thereafter move the court to reinstate the case on the trial docket for the purpose of taking such further evidence as might be necessary to determine this issue.