UNITED PACIFIC INSURANCE COM-
PANY, a Washington corporation,
Plaintiff,

v.

JOHNSON–GILLANDERS COMPANY,
Inc., a North Dakota corporation, San-
der Johnson, Walter S. Johnson, Ken-
neth R. Budge, Agnes Johnson and
Ethelyn D. L. Budge, Defendants.

Civ. No. 4325.

United States District Court
D. North Dakota,
Northeastern Division.

March 1, 1968.

As Amended March 4, 1968.

James L. Lamb, of Degnan, McElroy, Lamb & Camrud, Grand Forks, N. D., for plaintiff.

Joe A. Walters, of O'Connor, Green, Thomas, Walters & Kelly, Minneapolis, Minn., and Edward M. Peterson, of Peterson & McMenamy, Grand Forks, N. D., for defendants.

## MEMORANDUM DECISION

RONALD N. DAVIES, District Judge.

Plaintiff United Pacific Insurance Company (United Pacific) commenced this action against Johnson-Gillanders Company, Inc. (Johnson-Gillanders), Sander Johnson, Walter S. Johnson, and Agnes Johnson,[1] seeking specific performance of the provisions of a "General Application and Agreement of Indemnity" (Agreement of Indemnity) executed by the defendants.

Johnson-Gillanders, a general contractor, is a North Dakota corporation, with its principal place of business located at Grand Forks, North Dakota. In 1961 Johnson-Gillanders consulted plaintiff's local agent concerning the writing of bonds in conjunction with prospective contracts on which Johnson-Gillanders was desirous of submitting bids. Prior to issuing any bonds, United Pacific re-

---

1. Kenneth R. Budge and Ethelyn D. L. Budge, also signatories to the agreement, were not properly served and, therefore, are not parties to this action.

quired that an agreement of indemnity be executed by Johnson-Gillanders, Sander Johnson and Walter S. Johnson. This was done September 8, 1961, and thereafter United Pacific issued payment and performance bonds with Johnson-Gillanders as principal, United Pacific as surety, and the various property owners as obligees.

The agreement of indemnity provided, inter alia, that:

"SECOND: The undersigned shall indemnify, and keep indemnified and save and hold harmless the Company against all loss, costs, damages, expenses and attorneys' fees whatever, and any and all liability therefor, sustained or incurred by the Company by reason of having executed or procured the execution of any such Bond; or sustained or incurred by reason of making any investigation on account thereof, the prosecuting or defending any action in connection therewith, obtaining a release therefrom or enforcing by litigation or otherwise any of the agreements herein contained. Payment of any such amounts shall be made to the Company by the undersigned as soon as the Company shall be liable therefor, whether or not it shall have paid out of its funds any portion thereof. The undersigned agrees to furnish money to the Contractor or to the Company as needed for the prompt payment of labor and materials used in performance of said contracts when and as requested to do so by the Company. The Company shall have the exclusive right for itself and for the undersigned to decide and determine when any claim, demand, suit or judgment upon any such Bond or Bonds shall, on the basis of liability, expediency or otherwise, be paid, settled, defended or appealed, and its determination shall be final, conclusive and binding upon the undersigned; and any loss, costs, charge, expense or liability thereby sustained or incurred as well as any and all disbursements on account of costs, expenses and attorneys' fees deemed necessary or advisable by the Company shall be borne and paid immediately by the undersigned together with legal interest. In the event of any payment, settlement, compromise or investigation, an itemized statement of the payment, loss, costs, damages, expenses or attorneys' fees, sworn to by any officer of the Company, or the voucher or vouchers or other evidence of such payment, settlement or compromise, shall be prima facie evidence of the fact and extent of the liability of the undersigned to the Company in any claim or suit hereunder and in any and all matters arising between the undersigned and the Company.

\*　　\*　　\*　　\*　　\*

"TWELFTH: In the event the Company is required or deems it necessary to reserve from its assets an amount to cover any claim or claims, contingent or otherwise, under any such Bond by reason of default of the undersigned Contractor, or by reason of claims filed or any dispute with the obligee under such Bond, or for any other reason whatsoever, the undersigned covenant and agree to deposit with the Company, in current funds and immediately upon demand, an amount sufficient to cover such reserve and such additional amounts as may be necessary to cover any increases therein, to be held by the Company as additional collateral security. All collateral security held by or assigned to the Company may be used by the Company at any time in payment of any claim, loss or expense which the undersigned have agreed to pay hereby, whether or not such claim, loss or expense arises out of or in connection with such Bond or contract under which such collateral is held. The Company may sell or realize upon any or all such collateral security, at public or private sale, with or without notice to the undersigned or any of them, and shall be accountable to the undersigned only for such surplus or remainder of such collateral security or the proceeds thereof as may be in the Company's possession after it has

been fully indemnified as in this agreement provided. The Company shall not be liable for decrease in value or loss or destruction of or damage to such security, however caused.

\* \* \* \* \*

"FIFTEENTH: Each of the undersigned expressly recognizes and covenants that this agreement is a continuing obligation applying to and indemnifying the Company as to any and all such Bonds heretofore or hereafter executed by it. Any of the undersigned may notify the Company at its Home Office in Tacoma, Washington, of such undersigned's withdrawal from this agreement; such notice shall be in writing and shall state when, not less than thirty days after receipt of such notice by the Company, such withdrawal shall be effective. Such undersigned will not be liable under this agreement as to any bonds executed by the Company after the effective date of such notice; provided, that as to any and all such Bonds executed or authorized by the Company prior to effective date of such notice, and as to any and all renewals, continuations and extensions thereof or substitutions therefor (and, if a proposal or bid bond has been executed or authorized prior to such effective date, as to any contract bond executed pursuant thereto) regardless of when the same are executed, such undersigned shall be and remain fully liable hereunder, as if said notice had not been served."

On June 1, 1962, Walter S. Johnson, anticipating extensive surgery, notified United Pacific in writing that he was withdrawing as personal indemnitor, pursuant to paragraph fifteen of the agreement.

On October 15, 1963, a second agreement of indemnity, identical in form, was submitted to Johnson-Gillanders and the individual defendants and executed by

them. Subsequently United Pacific issued bid, payment and performance bonds with Johnson-Gillanders as principal and United Pacific as surety.

During the fiscal year ending June 30, 1965, Johnson-Gillanders sustained a loss of approximately forty thousand dollars. In September of that year United Pacific informed its local agent that Johnson-Gillanders' "line of credit" [2] had expired and that future bonds would be issued on a "submit" basis only.

On October 20, 1965, a meeting was held in Grand Forks between representatives of United Pacific and Johnson-Gillanders, during which Johnson-Gillanders was informed that United Pacific would not issue any future bonds because of the financial condition of the corporation, the advanced age of Sander Johnson, principal stockholder, and the physical condition of Walter S. Johnson, president and general manager. Johnson-Gillanders then offered to reorganize by bringing in new management and securing additional capital. A tentative agreement was reached whereby United Pacific would continue to issue bonds on a strict "submit" basis until reorganization was completed and additional financing secured.

On October 22nd United Pacific instructed its Grand Forks agent to advise Johnson-Gillanders that " \* \* \* you will be in no position to issue any bid bonds or final bonds for them until such time as the current audit has been completed and the steps of reorganization taken."

Desiring to bid on a school in East Grand Forks, Minnesota, Walter S. Johnson, president of Johnson-Gillanders, contacted United Pacific concerning the issuance of bonds and was informed on November 4, 1965, that no bonds would be issued until reorganization was completed. Walter S. Johnson then requested a "complimentary bid bond" [3] and United

2. Overall contract amount for which a surety will write bonds for any one contractor.

3. A "complimentary bid bond" is one issued when a contractor submits a bid to the project owner so far in excess of anticipated construction cost that acceptance of the bid is unlikely.

Pacific agreed to provide the bond providing that the bid submitted be so high that it would be rejected and that in any event United Pacific be under no obligation to furnish the final bonds. The bid submitted by Johnson-Gillanders on this project was rejected.

By December 30, 1965, complex fiscal arrangements were being made and one Richard P. Campbell, not previously employed by Johnson-Gillanders, had been engaged to become president and general manager of the corporation. Shortly after January 1, 1966, Sander Johnson, owner of all Johnson-Gillanders stock, placed the stock in a voting trust managed by Walter S. Johnson, Sander L. Johnson, Jr. and Richard P. Campbell. Campbell was elected to the board of directors and made president of Johnson-Gillanders.

After assuming his duties as president and general manager, but prior to execution of all the documents necessary for the corporate reorganization, Campbell consulted United Pacific's Grand Forks agent about submitting a complimentary bid to the Regents of the University of Minnesota for construction of student housing additions at the University of Minnesota, Duluth Branch. The agent agreed to write the bid bond and Johnson-Gillanders submitted a bid. Apparently the "complimentary" bid was not high enough and Johnson-Gillanders was awarded the $608,369 contract on May 26, 1966. United Pacific felt that under the circumstances final bonds should be issued and they were.

After bidding on the Duluth project, but before its being awarded, Campbell had secured a commitment from United Pacific to write the necessary bonds if a bid submitted to the Regents of the University of Minnesota for construction of a residence hall at the University of Minnesota, Morris Branch, was accepted. This contract was awarded to Johnson-Gillanders on May 18, 1966, in the amount of $368,355 and United Pacific issued the necessary bonds.

On May 25, 1966, United Pacific established with its local agent a line of credit for Johnson-Gillanders in the sum of $600,000. Thereafter in 1966, Johnson-Gillanders bid on and were awarded contracts with Northwood State Bank, Northwood, North Dakota, for $120,214; with the State Board of Higher Education, Bismarck, North Dakota, for $34,477; with WDAY, Inc., Fargo, North Dakota, for $85,220; and with Minnkota Power Cooperative, Inc., Grand Forks, North Dakota, for $192,820. United Pacific issued payment and performance bonds in conjunction with all of these contracts.

On January 3, 1967, the corporation having sustained a substantial loss, Campbell resigned as president and director of Johnson-Gillanders, but was retained to supervise the completion of all construction projects previously undertaken. Walter S. Johnson was then elected president of the corporation and assumed control of the company.

Early in 1967 Johnson-Gillanders had work in progress on seven contracts underwritten by United Pacific which were to be completed that year. A review of the corporation's records by United Pacific revealed an anticipated overall loss of approximately $55,000, although none of the projects were in default at that time.

On March 13, 1967, a joint control agreement was entered into between United Pacific and Johnson-Gillanders with the Red River National Bank, Grand Forks, North Dakota, as trustee. The agreement provided for setting up a special account in the trustee bank to receive funds paid under the contracts with Johnson-Gillanders and United Pacific to exercise joint control over disbursements. In addition Johnson-Gillanders was to deposit $55,500 additional funds in the special account. These funds were to come from a life insurance policy owned by Johnson-Gillanders on the life of Walter S. Johnson, from proceeds of a loan obtained by mortgaging real estate and equipment owned by Johnson-Gillanders, and from a life insurance policy owned by Walter S. Johnson and covering his own life. Only $37,000 of the $55,500 was ever deposited in the special account.

On August 23, 1967, it was apparent that Johnson-Gillanders could not complete the bonded projects without sustaining a substantial loss and United Pacific made demand upon the indemnitors to provide Johnson-Gillanders with sufficient funds to satisfy all bonded obligations or to deposit $129,000, the approximate amount of unpaid contract balances, with United Pacific, pending a determination of the exact amount necessary to reimburse United Pacific for losses and expenses incurred. The indemnitors refused this demand.

All of the projects were substantially completed by September, 1967, with Johnson-Gillanders having sustained an unpaid deficit of approximately $126,000. This action was commenced September 13, 1967, by United Pacific seeking specific performance of the indemnity agreement and especially the portions thereof set forth in the second and twelfth paragraphs.

The individual defendants seek to avoid liability under the agreement of indemnity by asserting that it had terminated prior to United Pacific's issuance of the payment and performance bonds under which the losses occurred; that if the indemnity agreement had not expired, the individual indemnitors had been discharged because the acts of United Pacific prejudiced the individual indemnitors' rights; and that in any event the joint control agreement constituted a novation which released the indemnitors from any liability.

■ Upon execution of the agreement of indemnity on October 15, 1963, the indemnitors knew that it was a continuing obligation and could only be terminated by sending written notice of withdrawal to United Pacific as provided in the fifteenth paragraph of the agreement. A contract of indemnity continues in force during the time provided by its terms. Employers Mutual Casualty Co. v. Piedmont Supply Co., D.C., 197 F.Supp. 159; Employers' Liability Assurance Corporation v. Tebbs, D.C., 137 F.Supp. 869.

While conceding that this would be one means of terminating the agreement the indemnitors argued that it could also be and was terminated by the acts of United Pacific when it communicated to Johnson-Gillanders on October 20, 1965, a refusal to issue any further bonds and then later agreed to issue bonds on a "submit" basis until such time as the corporation was reorganized and refinanced.

■ The agreement of indemnity was between the indemnitors and United Pacific while the issuance of bonds was a matter between Johnson-Gillanders and United Pacific and, as such, were separate and distinct contracts. Liability of the indemnitors could arise only if United Pacific chose to issue bonds on which Johnson-Gillanders was principal. Any conditions which United Pacific imposed upon Johnson-Gillanders prior to the issuance of bonds would not discharge the indemnitors unless the conditions materially increased their risk or prejudiced their rights. American Casualty Co. of Reading, Pa. v. Idaho First Nat. Bank, (9 Cir. 1964) 328 F.2d 138; Hiern v. St. Paul-Mercury Indemnity Company, (5 Cir. 1959) 262 F.2d 526.

■ Nor can the indemnitors challenge the propriety of United Pacific's issuance of final bonds on the Duluth contract on the basis that it was merely a complimentary bid that was accepted.

"Where a surety, without constraint or deception, executes a bond guaranteeing the performance of a contract by his principal, and thereby secures the benefits intended by it for the principal, and a breach occurs, it is then too late to raise the question of the validity of the principal's contract. 'The parties are estopped from availing themselves of such a defense.' (Citation omitted) The estoppel against a third party indemnitor in such case is even clearer, for it is his assurance which induces the surety to become liable upon the principal's bond." Carroll v. National Surety Co., (1928) 58 App. D.C. 3, 24 F.2d 268.

Although the foregoing case could be distinguished as one where the indemnitors attempted to challenge the validity of the

principal's contract, the theory is applicable, and this is especially true in the instant case where the individual indemnitors were active participants in the actions complained of and at all times either controlled or had the power to control the operations of Johnson-Gillanders.

██ The final contention of the indemnitors, that the joint control agreement constituted a novation is equally without merit. Novation cannot be presumed, and in the absence of any reference in the joint control agreement as to whether or not it did constitute a discharge of the indemnitors' obligations under the agreement of indemnity, novation must be determined by ascertaining the intent of the parties.

The joint control agreement provided, in part, that:

> "Upon termination of all of Surety's liability under its bonds, without loss, cost or expense to it, or its indemnitors, any funds remaining in the account shall be paid to Bank to the extent necessary to satisfy any indebtedness of Contractor to Bank and then any remaining balance shall be paid to the Contractor.

> "This agreement shall in no way vary, alter or diminish the existing obligations of Contractor to Surety under the terms of the General Application and Agreement of Indemnity-Contractors form executed by Contractor on October 15, 1963, and shall in no way be construed to extend or modify the obligations of the Surety under its various bonds nor in any manner construed as an undertaking by the Surety to pay or reimburse any third party."

This does not indicate an intention to discharge the indemnitors' obligations, but on the contrary, that United Pacific intended to and did obtain additional security against potential losses.

Johnson-Gillanders Company is directed to release to United Pacific Insurance Company all of its claims to outstanding contract funds and will direct the persons or entities owing such outstanding contract funds to Johnson-Gillanders to pay the same over to United Pacific Insurance Company.

Johnson-Gillanders Company, Inc., Sander Johnson, Walter S. Johnson and Agnes Johnson are specifically required to perform their obligations as set forth in the General Application and Agreement of Indemnity executed by them October 15, 1963, as contained in the second paragraph thereof, or in the alternative, those obligations contained in the twelfth paragraph thereof.

Counsel for United Pacific will prepare and transmit to the Clerk instruments necessary to effectuate this Memorandum Decision, which is considered in compliance with Fed.Rules Civ.Proc. 52(a).